[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SET ASIDE THE VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON WITH REGARD TO JOINT AND SEVERAL LIABILITY
After a jury trial in this action in which the plaintiff sought to recover legal fees from the defendants, its former clients, the jury awarded the plaintiff $596,324.28 and responded affirmatively to the following jury interrogatory:
7. Have the Pilots[defendants] proven by a preponderance of the evidence that both Updike, Kelly Spellacy and the Pilots intended the obligation of the Pilots under the contract to be several with each pilot owing only his pro rata share?
The plaintiff has moved for a directed verdict and a judgment notwithstanding the verdict with respect to the jury's finding that the agreement between the plaintiff and the defendants did not impose joint and several liability.
Facts
The following evidence was presented at trial. Prior to December 1991, each of the defendants was employed by Pan American World Airways ("Pan Am") as either a Captain, First Officer or Flight Engineering Officer. Beginning in the fall of 1991, and continuing thereafter the defendants CT Page 17226 and other present and former employees of Pan Am (the "Pilots") executed a written agreement with Attorney Scott Karsten whereby Attorney Karsten agreed to represent the Pilots in a breach of fair representation claim under the Railway Labor Act against Airline Pilots Association International ("ALPA") and certain union officials and the defendants agreed to pay Attorney Karsten certain stated fees and expenses incurred in connection with the litigation ("Karsten Agreement").
The Karsten Agreement consisted of a letter to defendant, Stewart Beckett, which identified the legal proceedings that were contemplated and the agreed upon hourly rates for legal fees and costs. The Karsten Agreement expressed an intention that, in the event Attorney Karsten affiliated himself with other counsel for purposes of the litigation, the parties would attempt to obtain the same fee arrangements with new counsel. The Karsten Agreement set forth the proposed fee arrangement between Attorney Karsten and the Pilots' group:
 We propose to conduct these proceedings from initiation through trial, if necessary, on behalf of all persons in your group who indicate by countersigning this letter their desire to participate. In view of uncertainties of recovery in this type of litigation, the need to devote substantial resources to its proper prosecution and the likely duration and complexity of the proceedings, we consider it fair to all concerned to alter the typical compensation arrangements of either a full usual hourly rate or a contingency fee comprised of one-third of any gross monetary recovery to the members of represented classes. Instead, as discussed, we propose to reduce my 1991 usual hourly rate of $175 to $100 per hour, with annual increases in that reduced rate effective January 1 of 1993 and each calendar year thereafter, in the amount of $10 per hour. In addition to that reduced hourly rate, we would receive a contingency fee in the amount of twenty percent (20%) of any gross monetary recovery by settlement or verdict. . . . The participants will, as is customary, remain responsible for expenses incurred during the course of the litigation. Regular accountings of expenditures, fees and activities will of course be provided to you or to your designee. (emphasis added)
The Agreement further provided that all bills would be sent to defendant Stewart Beckett or his designee; not to each individual CT Page 17227 defendant. The letter requested defendant Beckett to distribute the terms of the Agreement to the "participating members [of his group]" The Agreement also contained a form whereby each member of the group could indicate his willingness to participate in the litigation pursuant to the terms and conditions of the letter.
Shortly thereafter, each pilot executed the form indicating his willingness to be a member of the group pursuing the litigation against ALPA and to be bound by the fee arrangements set forth in the Karsten Agreement.
In December 1991 and early January 1992, Attorney Karsten and Attorney Suzann Beckett approached Updike Kelly to discuss the Pilots' claims and the possible retention of Updike Kelly to assist in the prosecution of the claims.
Following these discussions, on January 7, 1992, Attorneys Karsten and Beckett, acting as counsel for and agents of the defendants, entered into an agreement with Updike Kelly in which Updike Kelly agreed to assist in the representation of the Pilots in connection with their claims against ALPA and union officials. The terms of Updike Kelly's agreement were similar to those contained in the Karsten Agreement (the "UKS Agreement").
The terms of the UKS Agreement relating to legal fees essentially mirrored those contained in the Karsten Agreement. The UKS Agreement provided that payment to Updike Kelly would consist of two parts: payment of periodic billings at a discounted hourly rate and, if appropriate, payment of a contingency fee. The UKS Agreement further provided that Updike Kelly's representation of the defendant pilots would be "consistent with the [Karsten's] retainer letters."
Between January 1992 and May 1, 1997, Updike Kelly represented the defendants in hotly contested litigation against ALPA and union officials. During Updike Kelly's representation of the Pilots defendant, Stewart Beckett, sent periodic progress reports to all of the Pilots explaining what he and Ed Spellacy had done on behalf of the group, how the group's claims were progressing and where the litigation stood. In addition to updating the group about the status of the litigation, these progress reports reminded the Pilots to contribute to the fund so that "our legal fees" can be paid.
The Pilots' case against ALPA consisted of numerous individual pilots listed individually as plaintiffs. Each of the pilots had an individual claim and individual damages. The Pilots ultimately tried their claims to a jury in the United States Court for the Eastern District of New York. CT Page 17228 The jury rendered a verdict as to liability in favor of most of the Pilots, but against some of the Pilots.
The plaintiff and Beckett and Spellacy agreed at the beginning of their relationship that assessments would be made twice a year against 100 pilots. No pilot was ever billed more than his individual pro rata share of legal fees and costs. When a group of pilots withdrew from the larger group represented by the plaintiff, the plaintiff sought to recover a pro rata share of attorneys fees from those pilots. The plaintiff sent out collection letters seeking to recover a pro rata share of attorneys fees from pilots who were late in paying. The plaintiff referred some pilots to a collection agency and the plaintiffs letters to the agency indicate that each pilot was responsible only for his share.
There was no evidence that anyone from the plaintiff law firm specifically indicated to the Pilots either verbally or in writing that the plaintiff intended to hold the Pilots jointly and severally liable for attorneys fees and costs.
Discussion of the Law and Ruling
"Under common-law rule, where two or more promissors enter into an agreement with a third party for one performance, there is a presumption that the promissors are contracting jointly in the absence of words of severance in the contract." Schubert v. Ivey, 158 Conn. 583, 587-588,264 A.2d 562 (1969); see also Restatement (Second) of Contracts, § 288 (1979). Connecticut law is in accord with this common law rule.158 Conn. at 588. The effect of such a joint obligation, as distinguished from a several obligation, is that each joint promissor is liable for the whole performance jointly assumed.
The plaintiff argues that its agreement with the Pilots for the payment of legal fees was and agreement for one performance made by two or more promissory, was silent about whether it was meant to impose joint and several liability and, therefore, was presumed to impose such liability on the defendants. The plaintiff further argues that nothing in the evidence overcame that presumption.
The defendants argue that there was no agreement for one performance by the plaintiff, but instead, the agreement between the plaintiff and the Pilots, was an agreement for many different performances, i.e., the representation of many different pilots with different claims in one lawsuit. The defendants also argue that to the extent the agreement between the plaintiff and Attorney Karsten, acting as agent for the Pilots, is construed as an agreement by many promissors for one performance, the evidence at trial was sufficient to overcome the CT Page 17229 presumption of joint and several liability.
The court agrees that the agreement between the plaintiff and the defendants could be seen as an agreement for many performances with many promissory and that there was evidence introduced at trial from which a jury could have concluded that both the plaintiff and the Pilots intended each individual pilot's obligation to be several only. Such evidence was sufficient to overcome any presumption in favor of joint and several liability. The Motions to Set Aside Verdict and for Judgment Notwithstanding the Verdict with respect to the issue of joint and several liability is denied.
 By the court, Aurigemma, J.